1   Mark A. Neubauer (SBN 73728)
    Meredith M. Moss (SBN 185357)
2   STEPTOE & JOHNSON LLP
    2121 Avenue of the Stars, Suite 2800
3   Los Angeles, California 90067-5052
    Telephone:(310) 734-3200
4   Facsimile: (310) 734-3300
    Email:     mneubauer@steptoe.com
5
6   Harry R. Schafer *pro hac vice*
    (Florida SBN 508667)
7   KENNY NACHWALTER, P.A.
    201 South Biscayne Boulevard
8   1100 Miami Center
    Miami, Florida  33131
9   Telephone:    (305) 373-1000
    Facsimile:    (305) 372-1861
10  Email:hschafer@kennynachwalter.com
11  Attorneys for Plaintiff
    LOUIS VUITTON MALLETIER
12

13              UNITED STATES DISTRICT COURT

14           NORTHERN DISTRICT OF CALIFORNIA

15                    OAKLAND DIVISION

16

17  LOUIS VUITTON MALLETIER,            | Case No.: CV 09-01062 CW (ADR)

18             Plaintiff,               | Hon. Claudia Wilken

19        vs.                           | **OPPOSITION BY PLAINTIFF LOUIS VUITTON MALLETIER TO DEFENDANT BUMB & ASSOCIATES' MOTION TO DISMISS PURSUANT TO 12(b)(6)**
20
21  THE FLEA MARKET, INC. d/b/a THE
    SAN JOSE FLEA MARKET, BUMB &        | Date:  May 21, 2009
22  ASSOCIATES, BRIAN BUMB,             | Time:  2:00 p.m.
    TIMOTHY BUMB, GEORGE BUMB,          | Place: Courtroom 2
23  JR., JEFFREY BUMB AND PATRICK       |        U.S. Courthouse
    DE TAR,                             |        1301 Clay Street, Suite 400S
24                                      |        Oakland, CA 94612-5212
25             Defendants.

26

27

28

## **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................ 1

II.   STATEMENT OF FACTS ................................................................ 3

    A.    The Parties ........................................................................... 3

        1.    Plaintiff Louis Vuitton ............................................... 3

        2.    Defendants, Including Defendant Bumb ...................... 4

        3.    Defendants Exercise Direct Control Over The Vendors And
Tenants At The Market .............................................. 4

    B.    Defendants Are Aware That Infringing Activity Takes Place At The
Market ................................................................................. 5

    C.    Injury To Plaintiff From The Infringing Activity .................... 6

    D.    The Present Lawsuit .............................................................. 7

III.  DEFENDANT FAILS TO MEET THE APPLICABLE STANDARDS ON
A MOTION TO DISMISS ................................................................ 7

IV.   THE COMPLAINT PROPERLY PLEADS A CAUSE OF ACTION FOR
CONTRIBUTORY INFRINGEMENT AGAINST BUMB ................ 9

    A.    Property Owners Such As Bumb May Be Liable For Contributory
Trademark Infringement ....................................................... 9

    B.    Plaintiff Has Properly Plead Bumb's Liability for Contributory
Trademark Infringement ..................................................... 17

V.    CONCLUSION ............................................................................... 21

1

## TABLE OF AUTHORITIES

2

**FEDERAL CASES**

3

Bell Atlantic Corp. v. Twombly,
   550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)......................................21

4

5

Brower v. County of Inyo,
   817 F.2d 540 (9th Cir. 1987) rev'd on other grounds 489 U.S. 593 109 S.Ct. 1378,
   103 L.Ed.2d 628 (1989)................................................................................. 15-16

6

7

Fonovisa, Inc. v. Cherry Auction, Inc.,
   76 F.3d 259 (9th Cir. 1996) ...................................................... 3, 7, 9, 11-14, 21

8

9

Freecyclesunnyvale v. The Freecycle Network, Inc.,
   2006 U.S. Dist. LEXIS 74767 (N.D.Cal. 2006) ............................................14

10

11

Gilligan v. Jamco Development Corp.,
   108 F.3d 246 (9th Cir. 1997) ...................................................................................7

12

13

Hard Rock Café Licensing Corp. v. Concession Services, Inc.,
   955 F.2d 1143 (7th Cir. 1992) ................................................ 3, 7, 11-14, 21

14

Hutchins v. Alameda County Social Services Agency,
   2008 U.S. Dist. LEXIS 69429 (N.D.Cal. 2008) ..........................................16

15

16

In re Netflix Antitrust Litigation,
   506 F.Supp.2d 308 (N.D. Cal. 2007) .............................................................8

17

18

Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,
   456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982).................................. 10-14

19

20

Lockheed Martin Corp. v. Network Solutions, Inc.,
   194 F.3d 980 (9th Cir. 1999) ................................................................ 13-14, 21

21

22

Louis Vuitton S.A. v. Lee,
   875 F.2d 584 (7th Cir. 1989) .............................................................................7

23

Pareto v. F.D.I.C.,
   139 F.3d 696 (9th Cir. 1998) ............................................................................8

24

25

Perfect 10, Inc. v. Visa Int'l. Service, Ass'n.,
   494 F.3d 788 (9th Cir. 2007) ..................................................................12, 14, 21

26

27

Sanders v. Kennedy,
   794 F.2d 478 (9th Cir.1986) ...............................................................................8

28

1

**FEDERAL STATUTES**

15 U.S.C. § 1114.................................................................................................................1

15 U.S.C. § 1117............................................................................................................1, 7

18 U.S.C. § 2320.................................................................................................................1

Fed.R.Civ.P. 8....................................................................................................................8

**STATE STATUTES**

Cal. Civ. Proc. Code Section 1161(4)...............................................................................15

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

## I.   **INTRODUCTION**

2          This is a contributory trademark infringement case brought by Plaintiff Louis

3   Vuitton Malletier ("Plaintiff" or "Louis Vuitton") against Defendants, the owners and

4   operators of the San Jose Flea Market (the "Market").  Plaintiff Louis Vuitton has sued

5   Defendants because they have knowingly allowed their vendors to engage in trademark

6   counterfeiting on their property.

7          Defendant Bumb & Associates ("Bumb") is the sole defendant that has moved to

8   dismiss the Complaint (the "Motion").  Bumb's primary argument is that because it

9   supposedly is just a "bare property owner", Bumb supposedly cannot be liable for the

10  unlawful conduct taking place on its property.[1]  Therefore, Bumb's Motion presents the

11  following question for the Court's resolution:  can a property owner that has actual

12  knowledge that unlawful activities are taking place on its property sit back, do nothing,

13  receive increased rental revenue by allowing the wrongdoers to operate, and then claim it

14  is immune from liability.  Louis Vuitton respectfully submits that the answer to that

15  question is a resounding "no."

16         Among other things, the allegations of the Complaint show that Bumb is not a

17  "bare property owner" with no knowledge of, or involvement in, the rampant trademark

18  counterfeiting on its property.  Bumb is much more.  Bumb jointly owns with co-

19  Defendant The Flea Market, Inc., d/b/a The San Jose Flea Market ("The Flea Market,

20  Inc.") all of the land, buildings, structures and fixtures upon which the Market is

21  operated.  Complaint, ¶ 6.  Contrary to what it would have the Court believe, Bumb has

22  control over what happens on its own property because Bumb leases out the entire

23  property to The Flea Market, Inc. (for substantial sums of money), which in turn enters

24  into leases with the various counterfeiters at the Market.  Complaint, ¶¶ 6-7.  Therefore, if

25  Bumb wanted to stop the counterfeiting taking place on its property, it could do so by

26

27  _____

[1] Trademark counterfeiting gives rise to both civil and criminal claims.  *See* 15 U.S.C. §§
28  1114-1117 (setting forth claims and recoverable damages); 18 U.S.C. § 2320 (subjecting
    individuals to fines of up to $2,000,000 and prison terms of up to ten years.)

1  demanding that its lessee, The Flea Market, Inc., took whatever steps were necessary to
2  rid the Market of counterfeiting, failing which, Bumb could terminate its lease with The
3  Flea Market, Inc.

4        In addition, even though Bumb is a separate entity from The Flea Market, Inc. --
5  the entity that actually leases space to the Market's trademark counterfeiters -- Bumb still
6  knows exactly what is going on its own property and has the power to stop the Market's
7  counterfeiters.  Indeed, the Complaint alleges that:

8      • Defendant Bumb is "closely related" to Defendant The Flea Market, Inc.
9        (Complaint, ¶ 6);

10     • Partners in Bumb – specifically, Defendants Brian Bumb, Timothy Bumb and
11       George Bumb, Jr. – also are shareholders, officers and directors of The Flea
12       Market, Inc. (Complaint, ¶¶ 7-10);

13     • Defendants Brian Bumb, Timothy Bumb and George Bumb, Jr. are "moving,
14       active and conscious forces behind the operations, actions and inaction" of The
15       Flea Market, Inc., Bumb and the Market (Complaint, ¶¶ 8-10);

16     • Defendants – including Bumb – inform each other of their actions, as well as
17       the lawful and unlawful activities transpiring at the Market (Complaint, ¶ 13);

18     • Defendants – including Bumb – exercise substantial control over the vendors
19       and tenants at the Market (Complaint, ¶¶ 32, 34-35); and

20     • Defendants – including Bumb - have allowed vendors and tenants at the
21       Market to sell and continue to sell counterfeit merchandise, despite having
22       actual knowledge that such wrongful conduct is occurring at the Market
23       (Complaint, ¶¶ 26-30).

24     Moreover, as we discuss below, Bumb is simply incorrect about the law of
25 contributory trademark infringement.  Flea market owners and operators who provide the
26 "necessary marketplace" for trademark counterfeits to sell their infringing products may
27 be liable for contributory trademark infringement where the market's owners or operators
28 knew, or should have known, of the illegal activity occurring on their property.

1   Fonovisa, Inc. v. Cherry Auction, Inc., 76 F.3d 259, 265 (9th Cir. 1996); Hard Rock Café

2   Licensing Corp. v. Concession Services, Inc., 955 F.2d 1143, 1149 (7th Cir. 1992).  A

3   "swap meet can not disregard its vendors' blatant trademark infringements with

4   impunity."  Fonovisa, 76 F.3d at 265.

5          Hence, even if we ignored that fact that Bumb should be considered an operator of

6   the Market through its ability (as landlord of The Flea Market, Inc.) to control what

7   happens at the Market, Bumb still is subject to liability because it owns the property

8   where it has actual knowledge that counterfeiting is taking place.  The law does not

9   permit owners of property such as Bumb to profit with impunity by putting their head in

10  the sand when they know that unlawful conduct is taking place on their property.

11         In the context of a motion to dismiss, the Court must take the allegations of the

12  Complaint and the reasonable inferences to be drawn therefrom as true.  Plaintiff has not

13  yet had the opportunity to conduct discovery in this matter, and is not required at this

14  preliminary stage to prove it can prevail.  Nor are Plaintiff and this Court bound to accept

15  the unsubstantiated assertions in Defendant's Motion regarding Bumb's conduct.

16         Accordingly, Plaintiff has sufficiently pled its claims for contributory trademark

17  infringement against Bumb, and Bumb's Motion should be denied in its entirety.

18                    **II.    STATEMENT OF FACTS**

19      **A.    The Parties**

20             1.    Plaintiff Louis Vuitton

21         Plaintiff Louis Vuitton is one of the most well-known manufacturers of luxury

22  items, and produces high quality luggage, handbags, and wallets, among other things.

23  Complaint, ¶ 14.  Louis Vuitton is the owner of the right, title and interest in numerous

24  duly-registered trademarks used in connection with its products (the "Louis Vuitton

25  Trademarks").  Complaint, ¶¶ 15-17.

26         In the United States, Louis Vuitton products are sold only through Louis Vuitton

27  stores, Louis Vuitton boutiques within department stores, such as Saks, Neiman Marcus,

28  and Bloomingdales, and on the eluxury.com and louisvuitton.com web sites.  Complaint,

¶ 21.  Louis Vuitton has never authorized the sale of its merchandise at the Market.
Complaint, ¶ 36.

### 2.  Defendants, Including Defendant Bumb

Defendants are the owners, operators, landlords, managing agents and/or
principals of the Market.  Complaint, ¶ 1.  The Market is located at 1590 Berryessa Road,
San Jose, California 95133 on one hundred twenty (120) acres of land (the "Property"),
and is the largest open-air flea market in the United States.  Complaint, ¶ 25.

All of the Defendants collectively own, supervise, manage and control the Market.
Complaint, ¶ 31.  Additionally, Defendant Bumb receives substantial sums of money
from its co-Defendant, The Flea Market, Inc., for the lucrative privilege of leasing the
Property to vendors, tenants, sub-tenants, lessees, sub-lessees, concessionaires, assignees,
and/or other occupants at the Market.  Complaint, ¶ 7.  Moreover, several of the
individual defendants – including Defendants Brian Bumb, Timothy Bumb and George
Bumb, Jr. -- are intimately involved both with The Flea Market, Inc., as well as with
Bumb.  Complaint, ¶¶ 8-10.

### 3.  Defendants Exercise Direct Control Over The Vendors And Tenants At The Market

Defendants exercise strict control over the vendors and tenants who do business at
the Market.  In fact, Defendants specifically reserve the right to remove vendors from the
Market if the vendors fail to abide by any of Defendants' rules and regulations.
Complaint, ¶ 35.

Among other things, Defendants require the Market's tenants and vendors to:

- refrain from selling certain types of products;
- sell only in permitted areas;
- permit inspection by the Market of their products;
- park only in the spot assigned to them;
- refrain from being rude to customers;

- <u>affirmatively represent to the Market the type of merchandise they will be selling</u>;
- leave the Market by a certain time each day;
- regulate the volume of any music they play at their space(s);
- carry certain insurance coverage;
- provide photographic identification in order to rent space(s);
- have a California Resale Permit; and
- comply with all of the Market's written terms and conditions.  Complaint, ¶ 35.

In short, the Market is a controlled environment where Defendants and the Market have comprehensive rules governing what vendors and tenants can sell, how goods are displayed and how vendors and tenants must behave.  <u>Id</u>.

## B.   <u>Defendants Are Aware That Infringing Activity Takes Place At The Market</u>

Defendants have consistently allowed tenants and vendors at the Market to sell and offer for sale merchandise bearing counterfeits of trademarks owned by Louis Vuitton.  Complaint, ¶ 1.  Indeed, <u>it is indisputable that Defendants knew, know, or have reason to know, of their tenants and vendors' acts of trademark counterfeiting at the Market</u> because, among other things:

- Law enforcement agencies have seized counterfeit items from vendors at the Market, including goods bearing counterfeits of the Louis Vuitton Trademarks, in plain view of Defendants.  Complaint, ¶ 29.
- Some of Defendants' counterfeiting vendors have also been served with cease and desist letters by various intellectual property owners and anti-counterfeiting organizations, in plain view of Defendants.  <u>Id</u>.
- In response to those cease and desist letters, some of Defendants' vendors have chosen to voluntarily surrender their goods bearing counterfeits of trademarks to the lawful trademark owners, also in plain view of Defendants.  <u>Id</u>

- For many years, Defendants had a "two strikes" policy of giving vendors that they knew to be engaged in counterfeiting at the Market the opportunity to continue to stay in business at the Market.  Complaint, ¶ 28.  (Indeed, several of the Defendants have expressly acknowledged the existence of the "two-strikes" policy.  *See* Answer of Defendants of The Flea Market, Inc. d/b/a The San Jose Flea Market, Brian Bumb, Timothy Bumb, George Bumb, Jr. and Patrick De Tar, ¶ 28.)

- Defendants themselves also have been notified on several occasions of some of the counterfeiting taking place at the Market, including the counterfeiting of the Louis Vuitton Trademarks.  Yet, Defendants failed to properly respond to this notification by frequently failing to evict these counterfeiters from the Market.  Complaint, ¶ 30.

Rather than fulfill their legal obligation to put a stop to the counterfeiting activity taking place on their property with their knowledge, Defendants instead have sat back and enjoyed the financial fruits of continuing to do business with these counterfeiters. Not only have Defendants repeatedly turned a blind eye when counterfeiting is taking place on their property, but they also have materially contributed to the counterfeiting activities taking place at the Market by providing the site and facilities and/or the environment and market for the infringing conduct.  Specifically, Defendants provide <u>all of the services necessary for their vendors and tenants to operate</u> on Bumb's property. Complaint, ¶ 32.

### C.   <u>Injury To Plaintiff From The Infringing Activity</u>

The counterfeiting of the Louis Vuitton Trademarks at the Market is likely to cause, is causing and will continue to cause a likelihood of confusion, deception and mistake on the part of consumers, the public and the trade.  This confusion causes, and will continue to cause, irreparable harm to Louis Vuitton and dilutes the distinctive quality of the Louis Vuitton Trademarks.  Complaint, ¶¶ 43-44.  Accordingly, Defendants must be enjoined from any further conduct contributing in any way to the counterfeiting

and infringement of the Louis Vuitton Trademarks.  Complaint, ¶ 46.  Defendants'
conduct also subjects them to substantial monetary exposure to Plaintiff.  Complaint, ¶¶
48-54; *see also* 15 U.S.C. § 1117.

### D.     The Present Lawsuit

Combating trademark counterfeiting is difficult for businesses.  Indeed, one court
has noted that "the sale of counterfeit merchandise has become endemic – **perhaps
pandemic**."  Louis Vuitton S.A. v. Lee, 875 F.2d 584, 588 (7th Cir. 1989) (emphasis
added).

In the context of a flea market, the trademark counterfeiting could not occur
without the enabling conduct of the market's owners and operators, which provide the
"necessary marketplace" where the infringing activity takes place.  Fonovisa, 76 F.3d at
265.  Accordingly, contrary to Bumb's erroneous insinuations that Plaintiff is somehow
obligated to sue the direct infringers, courts have found – as discussed further below --
that a flea market's owners and operators may be liable for contributory trademark
infringement where they know, or have reason to know, of their vendors' acts of
infringement.  *See* Id. at 264-65; Hard Rock, 955 F.2d at 1149.  The gist of the case law is
clear.  You cannot know that wrongful conduct is occurring on your property and do
nothing about it.

As a result of the Defendants' actions and inactions, Plaintiff Louis Vuitton has
brought two claims against Defendants – one for damages for contributory trademark
infringement, and one for injunctive relief for contributory trademark infringement.[2]
Complaint, ¶¶ 49-58.

### III.     DEFENDANT FAILS TO MEET THE APPLICABLE STANDARDS ON A MOTION TO DISMISS

A "motion to dismiss for failure to state a claim is **viewed with disfavor and is
rarely granted**."  Gilligan v. Jamco Development Corp., 108 F.3d 246, 249 (9th Cir.

---

[2] Contrary to what Bumb suggests in its Opposition, Plaintiff has not alleged any claim
for vicarious trademark infringement.

OPPOSITION BY PLAINTIFF TO MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)

Doc. # CC-203735

1997) (test is not whether plaintiff will ultimately prevail, but whether claimant is entitled to offer evidence to support the claims) (internal quotation marks and citations omitted; emphasis added).  This case does not present such a "rare" circumstance; accordingly, Bumb's motion should be denied.

The Federal Rules of Civil Procedure merely require "a short and plain statement of the claim[.]"  Fed.R.Civ.P. 8.  It is well-established that, in the context of a motion to dismiss, "**[a]ll allegations of material fact <u>are taken as true</u>** <u>and construed in the light most favorable to plaintiff</u>."  <u>In re Netflix Antitrust Litigation</u>, 506 F.Supp.2d 308 (N.D. Cal. 2007) (emphasis added); *see also* <u>Sanders v. Kennedy</u>, 794 F.2d 478, 481 (9th Cir.1986).  In addition, "<u>all reasonable inferences</u>" from the allegations of the complaint likewise are taken to be true.  <u>Pareto v. F.D.I.C.</u>, 139 F.3d 696, 699 (9th Cir. 1998) (emphasis added).

As will be shown below, at this preliminary state of the litigation, Plaintiff has properly and sufficiently pled its contributory trademark infringement claims against Bumb.  Defendant Bumb owns the property where the trademark counterfeiting is occurring (and has occurred) and it has actual knowledge of such counterfeiting.  Complaint,  ¶¶ 6-7, 26-30.  In addition, Bumb is closely related to The Flea Market, Inc. and leases the very property Bumb owns to The Flea Market, Inc. for its operation of the Market.  Moreover, Bumb has the ability to control what occurs at the Market through its lease of its property to The Flea Market, Inc.  Complaint, ¶ 6-7.  Furthermore, Defendants Brian Bumb, Timothy Bumb and George Bumb, Jr. operate both Bumb and The Flea Market, Inc. and all of these closely related individuals and entities inform each other of their conduct and of the illegal activity taking place at the Market.  Complaint, ¶ 6-10, 13.  And, Bumb has failed to stop the wrongful conduct occurring on its property and has continued to provide the necessary marketplace for the Market's counterfeiters, thereby leading to further trademark counterfeiting on its property.  Complaint, ¶¶ 26-34.

Construing the allegations of the Complaint and the reasonable inferences therefrom in the light most favorable to Plaintiff -- as the Court is compelled to do at this

stage -- Plaintiff should be given the opportunity to put on evidence to prove its claims. Hence, Bumb's Motion should be denied in its entirety.

## IV.   THE COMPLAINT PROPERLY PLEADS A CAUSE OF ACTION FOR CONTRIBUTORY INFRINGEMENT AGAINST BUMB

It is well-established that liability for trademark infringement is not limited merely to those who directly infringe a mark.  The Ninth Circuit has explained that:

> [j]ust as liability for copyright infringement can extend beyond those who actually manufacture or sell infringing materials, **our law recognizes liability for conduct that assists others in direct trademark infringement**.  Fonovisa, 76 F.3d at 264 (emphasis added).

Here, Plaintiff has alleged that the Defendant owners and operators of the Market have knowingly enabled and allowed their vendors to engage in trademark counterfeiting on the very property that Defendants own and control.  Complaint, ¶¶ 26-33. Conspicuously, Bumb's Motion does not dispute that a claim for contributory trademark infringement is a viable claim.  Instead, Bumb argues that as a supposed "bare property owner", it cannot be liable for such contributory infringement.  However, Bumb's contention must be rejected.  Besides being contrary to the law of contributory trademark infringement, the allegations against Bumb are not limited to mere allegations of absentee property ownership.  Accordingly, Plaintiff's contributory trademark infringement claims against Bumb should stand, and Bumb's Motion should be denied.

### A.   Property Owners Such As Bumb May Be Liable For Contributory Trademark Infringement

As the Ninth Circuit has explained, "[c]ontributory infringement originates in tort law and stems from the notion that one who directly contributes to another's infringement **should be held accountable**."  Fonovisa, 76 F.3d at 264 (emphasis added).  Many years ago, the United States Supreme Court expressly held that "liability for **trademark infringement** can extend beyond those who actually mislabel goods with the mark of

1    another." Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 456 U.S. 844, 853, 102

2    S.Ct. 2182, 72 L.Ed.2d 606 (1982) (emphasis added).

3         In Inwood, generic manufacturers of a drug "duplicate[d] the appearance of a

4    similar drug marketed by a competitor under a registered trademark[.]" Inwood, 456

5    U.S. at 846.  The trademark owner (Ives) sued under, *inter alia,* the Lanham Act,

6    asserting that by using "look-alike capsules" in the same color as arbitrarily chosen by

7    Ives for the original drug, the generic manufacturers had "induce[d] pharmacists illegally

8    to substitute a generic drug [for the original] and to mislabel the substitute drug[ ]." Id. at

9    850.  In holding that the manufacturers could be liable for contributing to the trademark

10   infringement of other parties in the distribution chain, the Supreme Court held that:

11
12              if a manufacturer or distributor intentionally induces another
13              to infringe a trademark, or if it continues to supply its product
                to one whom it **knows or has reason to know** is engaging in
14              trademark infringement, **the manufacturer or distributor is**
                **contributorially responsible** . . . Id. at 853 (emphasis
15              added).

16        Thus, Inwood teaches that one with knowledge or constructive knowledge that his

17   actions or inactions are enabling or assisting another person to commit trademark

18   infringement will be liable for contributory trademark infringement.  In that regard, a

19   general knowledge (actual or constructive) of infringing activity is sufficient; knowledge

20   of specific sales is not required.  Id. at 855.

21        Bumb attempts to cling to a narrowly-circumscribed  reading of the "supply a

22   product" language in the Inwood in Bumb's recitation of the elements of a claim for

23   contributory trademark infringement.  Opposition, p. 5.  However, both the Seventh and

24   Ninth Circuits have considered the principles of Inwood *in the specific context of a flea*

25   *market,* and have found that owners and operators of a flea market (which provide the

26   forum and facilities for their vendors' conduct) can be liable for contributory trademark

27   infringement where they knew, or should have known, of the infringing conduct

28

Case No. CV 09-01062 CW (ADR)
OPPOSITION BY PLAINTIFF TO MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)

Doc. # CC-203735

1    occurring on the property.  *See* Fonovisa, 76 F.3d at 264-65 and Hard Rock, 955 F.2d at

2    1148.

3            The Seventh Circuit first tackled the issue in Hard Rock, and explained that

4                    CSI [**the flea market] is responsible for the torts of those it**
5                    **permits on its premises "knowing <u>or having reason to</u>**
                     **<u>know</u> that the other is acting or will act tortiously**…."
6                    Restatement (Second) of Torts § 877(c) & cmt. d (1979).  The
                     common law, then, <u>imposes the same duty on landlords and</u>
7                    <u>licensors that the Supreme Court has imposed on</u>
                     <u>manufacturers and distributors</u>.    In the absence of any
8                    suggestion that a trademark violation should not be treated as
                     a common law tort, we believe that the *Inwood Labs.* test for
9                    contributory liability applies.    **CSI may be liable for**
10                   **trademark violations by Parvez [a vendor at the flea**
                     **market] <u>if it knew or had reason to know of them.</u>**  Hard
11                   Rock, 955 F.2d at 1148-49 (bold and some underline
                     emphasis added).
12

13

14           The facts in Hard Rock differed from those here in that in Hard Rock, the

15   supervision of the flea market was "minimal", <u>Id</u>. at 1146, in contrast to the extensive

16   control over the Market and its vendors alleged to have been exercised by Defendants in

17   the instant case.  Complaint, ¶ 35.  Additionally, whereas Hard Rock did not warn CSI in

18   advance of filing suit that the goods being sold at the market were counterfeit, and there

19   was no proof of actual knowledge on the part of the flea market (Hard Rock, 955 F.2d at

20   1147), here, Defendants – including Bumb – repeatedly were warned and otherwise made

21   aware of the trademark counterfeiting taking place at the Market, but largely failed to do

22   anything about it.  Complaint, ¶¶ 26-30, 34.  Yet, even under the less favorable facts in

23   Hard Rock, the Seventh Circuit remanded the case for further proceedings because it

24   found that "**CSI may bear contributory liability** for Parvez's unlawful sales[.]"  Hard

25   Rock, 955 F.2d at 1150 (emphasis added).

26           The Ninth Circuit agreed with Hard Rock in Fonovisa, *supra,* a case involving a

27   Rule 12(b)(6) motion with strong factual resemblance to the present case.  In Fonovisa,

28   plaintiff Fonovisa owned copyrights and trademarks to certain music recordings.

---

Case No. CV 09-01062 CW (ADR)
OPPOSITION BY PLAINTIFF TO MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)

Doc. # CC-203735

Counterfeit recordings were being sold by vendors at defendant Cherry Auction's flea market, and it was undisputed that "Cherry Auction and its operators were aware that vendors in their swap meet were selling counterfeit recordings in violation of Fonovisa's trademarks and copyrights." Fonovisa, 76 F.3d at 261. Fonovisa sued Cherry Auction for, among other things, contributory trademark infringement. Id.

The Fonovisa court referenced the above-quoted statement by the Supreme Court in Inwood regarding contributory trademark infringement, and then went on to note that

> the *Inwood* case involved a manufacturer-distributor, and the *Inwood* standard has generally been applied in such cases. The Court in *Inwood*, however, **laid down no limiting principle that would require defendant to be a manufacturer or distributor**. Id. at 264-65.

Indeed, the Ninth Circuit in Fonovisa emphasized that "plaintiffs correctly point out that while Cherry Auction is not alleged to be supplying the recordings themselves, **it is supplying the necessary marketplace** for their sale in substantial quantities." Id. at 265 (emphasis added). That is precisely what Bumb, as well as the other Defendants, are doing here. Complaint, ¶ 32. They are supplying the necessary marketplace for their counterfeiting vendors.

In other words, the principles of contributory trademark infringement set forth in Inwood are not limited to cases where the defendant physically supplies the infringing product to the direct infringer; instead, they also include situations where the defendant supplies a forum that enables or increases the occurrence of the infringing activity. Fonovisa, 76 F.3d at 265; *see also* Perfect 10, Inc. v. Visa Int'l. Service, Ass'n., 494 F.3d 788, 799 (9th Cir. 2007). Accordingly, the Ninth Circuit, in Fonovisa agreed with the Hard Rock court's holding that a company "is responsible for the torts of those it permits on its premises knowing or having reason to know that the other is acting or will act tortiously." Fonovisa, 76 F.3d at 265. In so holding, the Fonovisa Court ruled that:

> **a swap meet cannot disregard its vendors' blatant trademark infringements with impunity.** Thus, Fonovisa

---

- 12 -                        Case No. CV 09-01062 CW (ADR)
OPPOSITION BY PLAINTIFF TO MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)

has <u>also stated a claim for contributory trademark
infringement</u>."  <u>Id</u>. (emphasis added).

With respect to the knowledge prong of the test, the <u>Inwood</u>-<u>Hard Rock</u>-<u>Fonovisa</u>
line of cases uniformly confirm that actual knowledge is not required; <u>constructive notice</u>
is sufficient to impose liability.  *See* <u>Inwood</u>, 456 U.S. at 853, <u>Hard Rock</u>, 955 F.2d at
1149 (explaining that the "'reason to know' part of the standard for contributory liability
requires [flea market owners and operators] (or [their] agents) to understand what a
reasonably prudent person would understand"), <u>Fonovisa,</u> 76 F.3d at 265.  Here, Plaintiff
has alleged facts that support both actual and constructive knowledge by Defendant
Bumb of the trademark counterfeiting activity at the Market.  Complaint, ¶¶ 13, 26-34;
*see also* <u>Hard Rock</u>, 955 F.2d at 1149 (confirming that "willful blindness is equivalent to
actual knowledge for purposes of the Lanham Act" and defining willful blindness as
"suspect[ing] wrongdoing and deliberately fail[ing] to investigate").  That is more than
enough to hold Bumb accountable for the wrongdoing it has allowed to occur on its
property.

Following <u>Fonovisa</u>, the Ninth Circuit again confirmed the broader application of
contributory trademark liability in a case cited by Defendant, <u>Lockheed Martin Corp. v.
Network Solutions, Inc</u>., 194 F.3d 980 (9th Cir. 1999).  In that case, Lockheed sued
Network Solutions, the then "sole National Science Foundation contractor in charge of
registering domain-name combinations for the top-level domains .gov, .edu, .com, .org
and .net[,]" claiming that Network Solutions was liable for contributory trademark
infringement because third parties had registered domain names that allegedly infringed
Lockheed's trademark rights.  <u>Lockheed</u>, 194 F.3d at 982-983.

Citing the <u>Hard Rock</u> decision, the Court in <u>Lockheed</u> expressly noted that
"*Inwood Lab.* has been applied in the **broader context of renting booth space at a flea
market**."  <u>Id</u>., 194 F.3d at 984.  The Ninth Circuit went on to discuss the Seventh
Circuit's analysis and confirm its adoption of that analysis in <u>Fonovisa</u>:

> **We adopted the *Hard Rock* analysis in <u>Fonovisa, Inc. v.
> Cherry Auction, Inc.</u>, 76 F.3d 259 (9th Cir.1996), holding**

1            **that a flea market could be liable for contributory infringement if it "suppl[ied] the necessary marketplace" for the sale of infringing products**. _Id_. at 265 (citing _Hard Rock,_ 955 F.2d at 1149).   Lockheed, 194 F.3d at 984 (emphasis added).

2

3

4

5       Since not all contributory trademark infringement claims will arise in the

6 manufacturer-distributor context that was before the Supreme Court in Inwood, the Ninth

7 Circuit in Lockheed then explained that:

8            Hard Rock and Fonovisa teach us that **when measuring and weighing a fact pattern in the contributory infringement context without the convenient "product" mold dealt with in _Inwood Lab._, we consider <u>the extent of control exercised by the defendant over the third party's means of infringement</u>.** _Hard Rock_, 955 F.2d at 1148-49 (noting the common-law responsibilities of a landlord regarding illegal activity on a rented premises); _see Fonovisa,_ 76 F.3d at 265 (adopting _Hard Rock's_ analysis).   **<u>Direct control and monitoring of the instrumentality used</u>** by a third party to infringe the plaintiff's mark permits the expansion of _Inwood Lab.'s_ "supplies a product" requirement for contributory infringement. Lockheed,194 F.3d at 984 (emphasis added).

9

10

11

12

13

14

15

16

17       Recently, in Perfect 10, Inc. v. Visa Int'l. Service, Ass'n., 494 F.3d 788 (9th Cir.

18 2007), the Ninth Circuit reiterated its prior holdings that the doctrine of contributory

19 trademark infringement is not limited to the manufacturer-distributor context of Inwood.

20 In doing so, the court once again considered how control exercised by the defendant over

21 the third party's means of infringement could satisfy Inwood's standard for imposing

22 liability.  Id. at 807.

23       With respect to the allegations of direct control and monitoring, this case is far

24 different on its facts from Freecyclesunnyvale v. The Freecycle Network, Inc., 2006 U.S.

25 Dist. LEXIS 74767 (N.D.Cal. 2006), in which this Court found that a mere allegation that

26 the plaintiff "'directly controls, monitors and holds a position of power as a moderator of

27 a Website which encourages others to use The Freecycle Network's Marks without

28 permission'" was insufficient to state a claim under the "supplies a product" prong of a

1   cause of action for contributory trademark infringement.  Conversely, the instant

2   Complaint describes <u>the numerous specific ways</u> in which Defendants – including Bumb

3   – own and exercise direct control over the Market and the activities that take place there.

4   Complaint, ¶¶ 32, 34-35.  The Complaint here also explains in detail <u>how</u> Defendants'

5   conduct supplies the necessary marketplace for Defendants' counterfeiting vendors and

6   otherwise enables the trademark counterfeiting activity at the Defendants' Market.

7   Complaint, ¶¶ 31-40;  *see also* further discussion in Section IV below.

8        Moreover, California law expressly provides that a lessee's "us[e of] the premises

9   for an unlawful purpose, thereby terminates the lease[.]"  Cal. Civ. Proc. Code Section

10   1161(4).  With such a potent sanction at Bumb's disposal, there can be no doubt that

11   Bumb can (and does) assert control over the conduct of The Flea Market, Inc. (and

12   thereby the vendors) at the Market.

13        Similarly, Bumb's attempt to attack the agency allegations of Paragraph 13 and

14   the use of the plural "Defendants" to include Bumb fails because the facts are far

15   different here than in the cases upon which Bumb relies.  For example, in <u>Brower v.</u>

16   <u>County of Inyo</u>, 817 F.2d 540, 542 (9th Cir. 1987), *rev'd on other grounds,* 489 U.S. 593

17   109 S.Ct. 1378, 103 L.Ed.2d 628 (1989), officers with the Inyo County sheriff's

18   department were engaged in a high-speed pursuit of Brower, who was believed to have

19   stolen a car.  The police directed the driver of a tractor-trailer rig to place the truck across

20   a highway to act as a roadblock.  Brower crashed into the truck and died.  His mother

21   then sued, claiming Brower's constitutional rights were violated.  In addition to the

22   County, the Sheriff's Department and other government defendants, the complaint also

23   named as defendants the truck driver, as well as the two owners of the tractor trailer rig,

24   asserting they were agents of the governmental defendants.  <u>Brower</u>, 817 F.2d at 542,

25   547.

26        In the context of the Section 1983 claim in <u>Brower</u>, the plaintiff had to allege that

27   the "specific conduct by a party was a proximate cause of the section 1983 injury."

28   <u>Brower</u>, 817 F.2d at 547.  The court found that no fact alleged against the truck owners

1   "could be a proximate cause of any of the alleged police wrongdoing[.]"  Id. at 548.  Nor

2   was there any basis for the allegation that the truck owners were acting in the course and

3   scope of an agency with the governmental defendants.  Id. at 547-48.  The court similarly

4   found no liability on the part of the driver, who did not act from an "independent motive"

5   and "did not agree to be a joint participant in prohibited acts of state officers[.]"  Id. at

6   548.

7        In contrast to the Brower case, Louis Vuitton has made specific allegations of an

8   on-going and intimate relationship between each of the Defendants with respect to each

9   other, as well as their ownership and operation of the Market.  Complaint, ¶ 6-10, 13, 31.

10  This is far different from alleging a purported agency relationship between a private

11  citizen and governmental entities in one lone spontaneous situation, and between whom

12  there was no prior involvement.

13       Nor is it improper for Plaintiff to make certain allegations on information and

14  belief.  As the court in Hutchins v. Alameda County Social Services Agency, 2008 U.S.

15  Dist. LEXIS 69429 (N.D.Cal. 2008) – cited by Defendant -- explained, "[p]leading on

16  information and belief is a desirable and essential expedient when matters that are

17  necessary to complete the statement of a claim **are not within the knowledge of the**

18  **plaintiff**[.]"  (Internal quotation marks and citations omitted; emphasis added.)  That is

19  precisely the case here, where, for example, Bumb's lucrative lease of its property to The

20  Flea Market, Inc. is in Defendants' possession and will be one of the first subjects of

21  Plaintiff's request for production of documents from Defendants.

22       Furthermore, Bumb's claim that it is akin to an innocent developer who leases out

23  a store front to an unrelated wayward counterfeiting vendor is without merit.  Bumb

24  controls the show at the Market by leasing out its property to The Flea Market, Inc.

25  Given the virtual identity of the players involved between Bumb and The Flea Market,

26  Inc., it cannot be disputed that when The Flea Market, Inc.'s officers, directors and

27  shareholders learn that the Market's vendors are counterfeiting the Louis Vuitton

28  Trademarks, these same persons – who are named Defendants in this case and who also

own and control Bumb (their closely held family partnership) – are then saddled with such knowledge in <u>all</u> of their capacities.  Such knowledge then mandates action on the part of Bumb to get its lessee, The Flea Market, Inc., to shape up and evict the Market's counterfeiters.  However, Bumb and the other Defendants take no such action because they do not want to do anything to decrease the hefty revenue stream coming from the Market and its stable of counterfeiters.

Apparently, Bumb believes it can set up a shell corporation that it will lease its property to, knowingly permit that shell to run a counterfeiting-laden flea market and then hide behind the legal fiction that it is just a "bare property owner", even if the shell has the same principals and agents as it does, even if Bumb has actual knowledge that illegal conduct is occurring on its own property, even if Bumb takes no action to prevent the unlawful conduct, and even if Bumb ultimately profits from the counterfeiters' rent payments to the shell.  The law simply does not permit such shenanigans.

**B.**     <u>**Plaintiff Has Properly Plead Bumb's Liability for Contributory Trademark Infringement**</u>

Based on the authorities discussed above, Plaintiff has unambiguously stated claims for contributory trademark infringement against Bumb and should be permitted to both discovery and present evidence in support of those claims.  Among other things, Plaintiff has alleged that:

1.  <u>Bumb is involved with the ownership and operation of the Market</u>:

- Defendant Bumb is an owner of the real property, structures, buildings and fixtures upon which the infringing activity is taking place (Complaint, ¶ 6).

- Defendant Bumb is "closely related" to Defendant The Flea Market, Inc. (Complaint, ¶ 6).

- Bumb actually leases its property to The Flea Market, Inc. and is handsomely compensated for doing so.  (Complaint, ¶ 7).

- Partners in Bumb – specifically, Defendants Brian Bumb, Timothy Bumb and George Bumb, Jr. – also are shareholders and directors of The Flea Market, Inc. (Complaint, ¶¶ 7-10).

- Defendants Brian Bumb, Timothy Bumb and George Bumb, Jr. are "moving, active and conscious forces behind the operations, actions and inaction" of The Flea Market, Inc., Bumb and the Market (Complaint, ¶¶ 8-10).

- Defendants – including Bumb – "collectively own, supervise, manage and control the Market" (Complaint, ¶ 31).

- Defendants – including Bumb – inform each other of their actions, as well as the lawful and unlawful activities transpiring at the Market (Complaint, ¶ 13).

2. The sale of counterfeit goods – including goods infringing Plaintiff's valuable trademarks – takes place at the Market:

- Plaintiff is a well-known producer of luxury goods, and holds the right, title and interest in numerous duly-registered trademarks that are used in connection with its products (Complaint, ¶¶ 14-24).

- Vendors and tenants at the Market have sold and continue to sell counterfeit merchandise, including merchandise that infringes and counterfeits Plaintiff's Louis Vuitton Trademarks (Complaint, ¶¶ 26-30, 37, 39-40).

3. Defendants – including Bumb -- are aware of the infringing activity at the Market:

- Defendants have allowed vendors and tenants at the Market to sell and continue to sell counterfeit merchandise, despite being aware of such unlawful activity by virtue of, among other things: 1) seizures of counterfeit goods by law enforcement, in plain view of Defendants; 2) service of cease and desist letters on counterfeiting vendors, in plain view of Defendants; 3) voluntary surrender by vendors of counterfeit goods in response to cease and desist letters, again in plain view of Defendants; 4) written notices to Defendants advising them of counterfeiting activity at the Market (Complaint, ¶¶ 26-30).

4. Defendants – including Bumb -- have and exercise direct control over the Market:

- Defendants exercise substantial direct control over the vendors and tenants at the Market, including by specifically restricting vendor conduct and requiring, among other things, vendors to disclose what items they will be selling at the Market and also permitting the inspection of their merchandise by the Market (Complaint, ¶¶ 32, 34-35).

- Defendants also reserve the right to remove vendors who fail to comply with the Market's rules and regulations (Complaint, ¶ 35).

- Defendants engage in their own efforts to patrol the Market and monitor the conduct of vendors and patrons (Complaint, ¶ 34).

5. Yet Defendants – including Bumb -- have not taken steps to stop the trademark counterfeiting activity at the Market, and indeed have condoned it:

- Defendants have frequently failed to evict known counterfeiters from the Market, and have otherwise failed to take action to prevent the sale of counterfeit Louis Vuitton items at the Market, including, without limitation, by failing to implement rules and regulations that would prevent such sales, and failing to conduct investigations for infringing goods (Complaint, ¶¶ 30-33).

- Defendants followed a "two-strikes" policy that enabled vendors known previously to have sold counterfeit goods at the Market to continue doing business at the Market.  (Complaint, ¶ 28; *see also* the Answer of Defendants The Flea Market, Inc. d/b/a The San Jose Flea Market, Brian Bumb, Timothy Bumb, George Bumb, Jr. and Patrick De Tar, which at paragraph 28 ***admits*** the existence of the "two-strikes" policy).

6. By providing the "necessary marketplace" for the sale of counterfeit goods, Defendants – including Bumb – enabled and contributed to the counterfeiting and infringement of the Louis Vuitton Trademarks:

- In addition to refusing to take action to bring the sale of counterfeit goods at the Market to a halt, Defendants also encourage infringing conduct by providing the site and facilities for the Market, which includes the services

- 19 -   Case No. CV 09-01062 CW (ADR)

OPPOSITION BY PLAINTIFF TO MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)

Doc. # CC-203735

required by vendors and tenants to operate on the property, including booth space, storage space, parking, security, maintenance and restroom facilities (Complaint, ¶ 32).

- Defendants also conduct substantial advertising activities to draw customers to the Market, thereby encouraging and resulting in the sale of counterfeit items (Complaint, ¶ 32).

7. <u>Defendant Bumb receives revenues from its involvement with the Market</u>:

- Bumb is paid "substantial sums" by The Flea Market, Inc. for Bumb's lease of its property to operate the Market (Complaint, ¶ 7).

- By permitting the sale of counterfeit goods at the Market, Defendants increase their profits from increased visitor traffic, booth and storage rentals, parking and concession revenue.  These revenues correspondingly increase the value of Defendants' businesses and property (Complaint, ¶ 39).

- Thus, Defendants – including Bumb – have been unjustly enriched by the counterfeiting activities at the Market, which, as shown, have taken place and continue to take place with their knowledge (Complaint, ¶ 47).

8. <u>Plaintiff has been damaged by the conduct of Bumb</u>:

- By virtue of the sale at the Market of goods infringing Plaintiff's trademarks, Plaintiff's reputation and good will have been damaged by, among other things, the likelihood that consumers will believe that the goods sold at the Market are genuine Louis Vuitton items, which they are not, and because those counterfeit products do not measure up to the quality of genuine Louis Vuitton merchandise (Complaint, ¶¶ 43-44).

- There is a likelihood that the counterfeiting of Plaintiff's Louis Vuitton Trademarks that takes place at the Market will cause "confusion , deception and mistake on the part of consumers, the public and the trade."  In turn, this dilutes the value of Plaintiff's trademarks (Complaint, ¶ 46).

1    In summary, Plaintiff has alleged that Defendants – including Bumb – provide a

2    forum that enables and increases the counterfeiting of the Louis Vuitton Trademarks, and

3    that Defendants (including Bumb) are aware of that illegal activity, but fail to take action

4    to stop it.  In fact, as the co-owner of the Property and as the landlord to The Flea Market,

5    Inc., Bumb is in the best position to eliminate the wrongful conduct that it knows is

6    occurring on its property.  However, it fails to do so, much to Plaintiff's detriment, while

7    at the same time unjustly enriching Defendants.

8    Having pled the elements set forth in <u>Fonovisa</u>, <u>Hard Rock</u>, <u>Lockheed</u> and <u>Perfect

9    10</u>, Plaintiff has sufficiently alleged its contributory trademark infringement claims

10   against Bumb.  Certainly, there can be no doubt that Bumb has received "fair notice of

11   what the … claim is and the grounds on which it rests."  <u>Bell Atlantic Corp. v. Twombly</u>,

12   550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal quotation marks and

13   citations omitted).  Consequently, Bumb's Motion should be denied.

14   ## V.  <u>CONCLUSION</u>

15   Based on settled principles of contributory trademark infringement law, and the

16   allegations of the Complaint, Plaintiff has stated claims for contributory trademark

17   infringement against Bumb.  Moreover, Bumb's unsubstantiated protestations to the side,

18   it is clear that Bumb is more than just a "bare property owner," and in any event may not

19   "turn a blind eye" to, or willfully ignore, the trademark counterfeiting that Bumb knows

20   is occurring on its property, that Bumb is perfectly capable of stopping, and that is

21   unjustly enriching Bumb and its co-Defendants.

22

23

24

25

26

27

28   ///

1    Accordingly, Plaintiff respectfully requests that the Court deny Bumb's Motion in

2  its entirety.  Plaintiff should be permitted to discover and put on evidence in support of its

3  claims against Bumb.  Nevertheless, in the event that the Court is inclined to grant

4  Bumb's Motion, Plaintiff respectfully requests that the Court grant Plaintiff leave to

5  amend its Complaint within 15 days.

6

7  Dated:  April 30, 2009                              STEPTOE & JOHNSON LLP
                                                        MARK A. NEUBAUER
8                                                       MEREDITH M. MOSS

9

10                                                      By:    /s/ Mark A. Neubauer
                                                               MARK A. NEUBAUER
11                                                      Attorneys for Plaintiff LOUIS VUITTON
                                                        MALLETIER
12

13  Dated:  April 30, 2009                              KENNY NACHWALTER, P.A.
                                                        HARRY R. SCHAFER
14

15

16                                                      By:    /s/ Harry R. Schafer
                                                               HARRY R. SCHAFER
17                                                      Attorneys for Plaintiff LOUIS VUITTON
                                                        MALLETIER
18

19

20

21

22

23

24

25

26

27

28